## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17-cv-3155 |
| v. | ) | |
| | ) | |
| Golden Valley Lending, Inc., Silver Cloud | ) | |
| Financial, Inc., Mountain Summit Financial, | ) | |
| Inc., and Majestic Lake Financial, Inc. | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF

The Consumer Financial Protection Bureau (Bureau) alleges the following against Defendants Golden Valley Lending, Inc. (Golden Valley), Silver Cloud Financial, Inc. (Silver Cloud), Mountain Summit Financial, Inc. (Mountain Summit), and Majestic Lake Financial, Inc. (Majestic Lake).

### INTRODUCTION

1.      The Bureau brings this action under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a), and the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.*, and its implementing regulation, Regulation Z, 12 C.F.R. part 1026, in connection with Defendants' collection of void loans and its failure to disclose annual percentage rates as required by law.

2.      Defendants originate and collect on installment loans that are void in whole or in part under state law. Defendants' collection on void loans is deceptive, unfair, and abusive. They

1

also violate the law by failing to disclose the applicable annual percentage rate for their loans when required to do so by law.

## JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

4.      Venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here and Defendants do business here. 28 U.S.C. § 1391(b)(2); 12 U.S.C. § 5564(f).

## PARTIES

5.      The Bureau is an independent agency of the United States Government created by the CFPA. 12 U.S.C. § 5491(a). The Bureau is charged with enforcing Federal consumer financial laws. 12 U.S.C. §§ 5511, 5564.

6.      The Bureau is authorized to initiate federal district court proceedings in its own name and through its own attorneys to address violations of Federal consumer financial law, including violations of the CFPA, 12 U.S.C. § 5564(a)-(b), and violations of TILA and Regulation Z, *id*.; 15 U.S.C. § 1607(a)(6).

7.      All Defendants are companies that are owned and incorporated by the Habematolel Pomo of Upper Lake Indian Tribe (Habematolel Pomo Tribe or the Tribe), a federally recognized Indian tribe located in Upper Lake, California.

8.      The Tribe's Rancheria is located in a rural part of California, and, at present, the Tribe has fewer than 300 enrolled members.

9.     Approximately 33% of those members live in Lake County, where the Rancheria is located.

10.     Golden Valley lists its principal place of business as 635 E Highway 20, Upper Lake, California 95485.

11.     Golden Valley is an online installment loan company providing installment loans throughout the United States through its Internet website: www.GoldenValleyLending.com.

12.     Since at least October 2012, Golden Valley extended credit and collected on the extension of credit in the form of online installment loans to consumers residing in this District and throughout the United States.

13.     Golden Valley extends credit and services loans offered or provided for use by consumers primarily for personal, family, or household purposes, 12 U.S.C. § 5481(15)(A)(i), and collects debt related to a consumer financial product or service, 12 U.S.C. § 5481(15)(A)(x), both of which are consumer financial products or services covered by the CFPA, 12 U.S.C. § 5481(5)(A); therefore, Golden Valley is a "covered person" under the CFPA, 12 U.S.C. § 5481(6)(A).

14.     Golden Valley is also a "creditor" under the Truth in Lending Act and Regulation Z. 15 U.S.C. § 1602(g); 12 C.F.R. § 1026.2(a)(17).

15.     Silver Cloud lists its principal place of business as 635 E Highway 20, Upper Lake, California 95485.

16.     Silver Cloud is an online installment loan company providing installment loans throughout the United States through its Internet website: www.SilverCloudFinancial.com.

17.     In the past, Silver Cloud provided installment loans through a different Internet website, www.usamoneyshop.com, but that website is not currently active.

18.     Since at least August 2012, Silver Cloud extended credit and collected on the extension of credit in the form of online installment loans to consumers residing in this District and throughout the United States.

19.     Silver Cloud extends credit and services loans offered or provided for use by consumers primarily for personal, family, or household purposes, 12 U.S.C. § 5481(15)(A)(i), and collects debt related to a consumer financial product or service, 12 U.S.C. § 5481(15)(A)(x), both of which are consumer financial products or services covered by the CFPA, 12 U.S.C. § 5481(5)(A); therefore, Silver Cloud is a "covered person" under the CFPA, 12 U.S.C. § 5481(6)(A).

20.     Silver Cloud is also a "creditor" under the Truth in Lending Act and Regulation Z. 15 U.S.C. § 1602(g); 12 C.F.R. § 1026.2(a)(17).

21.     Mountain Summit lists its principal place of business as 635 E Highway 20, Upper Lake, California 95485.

22.     Mountain Summit is an online installment loan company providing installment loans throughout the United States through its Internet website: www.MountainSummitFinancial.com.

23.     Since at least May 2014, Mountain Summit extended credit and collected on the extension of credit in the form of online installment loans to consumers residing in this District and throughout the United States.

24.     Mountain Summit extends credit and services loans offered or provided for use by consumers primarily for personal, family, or household purposes, 12 U.S.C. § 5481(15)(A)(i), and collects debt related to a consumer financial product or service, 12 U.S.C. § 5481(15)(A)(x), both of which are consumer financial products or services covered by the CFPA, 12 U.S.C.

§ 5481(5)(A); therefore, Mountain Summit is a "covered person" under the CFPA, 12 U.S.C.
§ 5481(6)(A).

25.     Mountain Summit is also a "creditor" under the Truth in Lending Act and
Regulation Z. 15 U.S.C. § 1602(g); 12 C.F.R. § 1026.2(a)(17).

26.     Majestic Lake lists its mailing address as 635 E Highway 20, Upper Lake,
California 95485.

27.     Majestic Lake is an online installment loan company providing installment loans
throughout the United States through its Internet website: www.mlfinc.com.

28.     Since at least August 2015, Majestic Lake extended credit and collected on the
extension of credit in the form of online installment loans to consumers residing in this district
and throughout the United States.

29.     Majestic Lake extends credit and services loans offered or provided for use by
consumers primarily for personal, family, or household purposes, 12 U.S.C. § 5481(15)(A)(i),
and collects debt related to a consumer financial product or service, 12 U.S.C. § 5481(15)(A)(x),
both of which are consumer financial products or services covered by the CFPA, 12 U.S.C.
§ 5481(5)(A); therefore, Majestic Lake is a "covered person" under the CFPA, 12 U.S.C.
§ 5481(6)(A).

30.     Majestic Lake is also a "creditor" under the Truth in Lending Act and Regulation
Z. 15 U.S.C. § 1602(g); 12 C.F.R. § 1026.2(a)(17).

## DEFENDANTS' BUSINESS PRACTICES

31.     Defendants extend high-cost, small-dollar installment loans over the Internet to
consumers across the United States.

32.     Golden Valley and Silver Cloud began originating and collecting on loans in 2012.

33.     Mountain Summit began originating and collecting on loans in 2014.

34.     Majestic Lake began originating and collecting on loans in 2015.

35.     Defendants make, and collect on, a large volume of installment loans.

36.     For example, on a single day in October 2013, Golden Valley originated (or attempted to originate) approximately 235 individual loans of between $300 and $1,000.

37.     From August 2013 to December 2013, Silver Cloud and Golden Valley originated a total of approximately $27 million in loans and collected a total of approximately $44 million from consumers.

38.     Defendants use service providers to perform many functions relating to the lending operations.

39.     In 2013, the Tribe purchased a call center in Overland Park, Kansas that had previously been a contracted service provider for Golden Valley and Silver Cloud. The Tribe incorporated the call center in May 2013.

40.     The call center provides customer service for Defendants.

41.     Defendants employ a network of lead generators and lead aggregators to find potential borrowers.

42.     Since at least 2014, the Tribe has owned its own lead generator that generates leads for Defendants as well as other lenders.

43.     Lead generators assess each lead, make an underwriting recommendation, and provide that information to the call center to contact consumers and complete the underwriting process for Defendants.

44.     At certain points during 2014, at least, the call center also coordinated leads for Silver Cloud loans.

**Defendants Originate High-Cost Loans Throughout the United States**

45.     Defendants originate, service, and collect high-cost, small-dollar installment loans in nearly all fifty states.

46.     Consumers can borrow between $300 and $1,200 from Defendants.

47.     The standard repayment schedule for loans offered by each Defendant is 20 payments over the course of 10 months, with one payment made every two weeks.

48.     For each installment payment, a consumer must pay a "service fee" (often $30 for every $100 of principal outstanding) and five percent of the original principal.

49.     As a result, Defendants offer loans with annual percentage rates of between approximately 440% and 950%.

50.     For an $800 loan, a typical loan contract requires the consumer to repay a total of approximately $3,320 over the course of ten months.

51.     The following excerpt is from a document prepared for an installment loan in the amount of $800 originated by Golden Valley in November 2014 and made to a resident of Joliet, Illinois:

7

**TRUTH IN LENDING DISCLOSURE**

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 875.5528% | $2,520.00 | $800.00 | $3,320.00 |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 1 | $280.00 | December 12, 2014 |
| 1 | $268.00 | December 26, 2014 |
| 1 | $256.00 | January 9, 2015 |
| 1 | $244.00 | January 23, 2015 |
| 1 | $232.00 | February 6, 2015 |
| 1 | $220.00 | February 20, 2015 |
| 1 | $208.00 | March 6, 2015 |
| 1 | $196.00 | March 20, 2015 |
| 1 | $184.00 | April 3, 2015 |
| 1 | $172.00 | April 17, 2015 |
| 1 | $160.00 | May 1, 2015 |
| 1 | $148.00 | May 15, 2015 |
| 1 | $136.00 | May 29, 2015 |
| 1 | $124.00 | June 12, 2015 |
| 1 | $112.00 | June 26, 2015 |
| 1 | $100.00 | July 10, 2015 |
| 1 | $88.00 | July 24, 2015 |
| 1 | $76.00 | August 7, 2015 |
| 1 | $64.00 | August 21, 2015 |
| 1 | $52.00 | September 4, 2015 |

**Defendants Originate Loans Through Their Websites
and Find Consumers Through Lead Generators**

52.     While Defendants acquire consumers in many cases from lead generators,

consumers can also apply for loans by going directly to Defendants' websites

(www.GoldenValleyLending.com, www.SilverCloudFinancial.com,

www.MountainSummitFinancial.com, and www.mlfinc.com).

53.      Defendants' websites are highly interactive, allowing consumers to apply for,

accept, and manage their loans online.

54.     In order to apply for a loan via any of Defendants' websites, the consumer must

first enter a series of personal information including: name, address, phone number, social

security number, bank and employment information, and the desired principal value.

55.     Each of Defendant's websites indicates that the consumer "will be approved within moments" if she qualifies for a loan.

56.     Defendants have credit inquiries performed for some potential customers to determine whether to accept their loan applications.

57.     Between February 2013 and June 2016, Defendants had over 597,000 credit inquiries performed.

58.     During that same period, Defendants had over 36,000 credit inquiries performed on consumers who resided in Illinois.

**Defendants Do Not Disclose the Annual Percentage Rate of the Loans in Advertising or When Customer Service Representatives Answer Questions Over the Phone**

59.      Each of Defendants' websites advertises the cost of installment loans and includes a rate of finance charge but does not disclose the annual percentage rates (APR).

60.     The "FAQ" section of each of the websites answers the question "How much does the consumer loan cost?" by stating "Our service fee is $30 per $100 loaned. This fee is charged every two weeks on your due dates, based upon the principal amount outstanding."

61.     The "How it Works" section of each of the websites also describes the finance charge by stating: "Each installment payment will contain a service fee of $30 per hundred borrowed, which is charged every two weeks, and an amount equaling five percent of your initial principal loan."

62.     Each of the following websites has failed to present the APR of a consumer's loan when the websites discussed the cost of the loans: www.GoldenValleyLending.com, www.SilverCloudFinancial.com, www.MountainSummitFinancial.com, and www.mlfinc.com.

63.     Instead, these websites simply state in fine print, "Complete disclosure of APR, fees, and payment terms are set forth in the loan agreement."

64. Golden Valley, at least, provides a loan agreement, and requests a borrower's electronic signature, only after a consumer applies for and is approved to receive a loan.

65. The websites listed above also display phone numbers that consumers may call to contact customer service representatives for Defendants.

66. When the customer service representatives are asked about the cost of the installment loans, they have failed to state the APR for a prospective borrower's loan or to provide a sample transaction.

67. Instead, the agents' oral disclosures generally describe the finance charge for each installment payment as a block rate of $30 per $100 of principal, a 30% finance charge, or the total amount the consumer would have to repay.

**Defendants Electronically Credit and Debit Consumers' Bank Accounts**

68. Defendants employ non-tribally-affiliated banks to transfer funds to and from consumers in the United States, typically through Automated Clearing House (ACH) credit and debit entries.

69. Defendants' websites (www.GoldenValleyLending.com, www.SilverCloudFinancial.com, www.MountainSummitFinancial.com, and www.mlfinc.com) indicate that once a consumer is approved for a loan, the loan funds will be disbursed directly into the consumer's checking account through an ACH transfer on the next business day, or potentially the same day at the consumer's request.

70. The websites further indicate the consumer may choose to receive funds by check.

71. In practice, a customer service representative of Mountain Summit stated that consumers may receive funds by paper check only for a loan of $300, and consumers may repay the loan by sending paper checks only if they receive funds in the form of a paper check.

10

72. Even if a consumer is permitted to send a check, at one point in time, Golden Valley's loan agreement stated that the lender could use the check to create an electronic fund transfer to allow the lender to withdraw the payment directly from the consumer's bank account.

73. Though it is not advertised on their websites, Golden Valley and Silver Cloud, at least, also disburse some loan funds through wire transfers that are deposited directly into consumers' bank accounts.

**Defendants' Operations Are Largely Conducted by Call Center Employees in Kansas**

74. For the first several years of their operation, at least, most of Golden Valley and Silver Cloud's day-to-day operations were conducted in Kansas.

75. The majority of the people who work on behalf of Defendants work in Kansas.

76. As of 2012, Golden Valley and Silver Cloud had created no more than 15 jobs on the Tribe's Rancheria.

77. In fact, in 2012 or 2013, Golden Valley, Silver Cloud, and Mountain Summit admitted to a bank that they were organized in California but operated in Kansas.

**Silver Cloud, at Least, Sold Participation Interests in Its Loans to a Kansas Company**

78. Beginning in late 2013, Silver Cloud received some funding via a so-called Participation Agreement with RM Partners LLC (RM Partners).

79. RM Partners is a limited liability company formed in Kansas.

80. Under that Participation Agreement, RM Partners had the right to purchase up to a 30% participation interest in Silver Cloud loans.

81. The agreement entitled RM Partners to a share in the repayment of principal and interest collected on those loans after accounting for certain costs.

82.     The agreement expressly contemplated Silver Cloud selling participation interests to other entities.

83.     The agreement required Silver Cloud to retain a 2.25% interest in the loans.

84.     An individual, Josh Landy ("Landy"), coordinated the process of obtaining signatures for the Participation Agreement from the Tribal chairperson and the managing member of RM Partners, Richard Moseley. Landy was involved in the operations of the call center in Kansas during at least 2013 and 2014.

**Silver Cloud and Golden Valley Received Funding From Other Companies that Were Not Initially Owned or Incorporated by the Tribe**

85.      Edison Creek, LLC (Edison Creek) and Nagus Enterprises, LLC (Nagus Enterprises) were limited liability companies created in Delaware in 2012.

86.     Cobalt Hills, LLC (Cobalt Hills) was a limited liability company created in Delaware in 2012.

87.     National Performance Agency, LLC (NPA) was a limited liability company created in Delaware in 2011 that operated in Kansas.

88.     In 2013, separate bank accounts held by Edison Creek, Nagus Enterprises, and Cobalt Hills listed Landy as a signatory.

89.     A bank account held by NPA listed Landy as a signatory.

90.     Between August and December 2013, RM Partners, Edison Creek, Nagus Enterprises, and Cobalt Hills collectively gave Silver Cloud and Golden Valley approximately $26.7 million.

91.     During that same period, Golden Valley and Silver Cloud paid those same four companies approximately $35.8 million.

12

92.     During the same timeframe, Golden Valley and Silver Cloud distributed approximately $536,000 to accounts held by the Habematolel Pomo Tribe.

93.     On August 20, 2014, Edison Creek and Nagus Enterprises were merged together along with at least two other limited liability companies. On the same day, the surviving entity was merged into a corporation wholly owned and operated by the Tribe.

94.     On August 20, 2014, Cobalt Hills merged with NPA, and the surviving entity merged into a corporation wholly owned and operated by the Tribe.

**Defendants Claim that Tribal Law Applies to the Consumer Loan Agreements**

95.     Defendants' loan agreements have contained a Governing Law provision that declares that the loans are made and accepted on tribal lands, and pursuant to tribal law, regardless of the consumers' home states.

96.     For example, a version of Golden Valley's loan agreement executed in 2015 included the following language:

> GOVERNING LAW: This Agreement is made and accepted in the sovereign territory of the Habematolel Pomo of Upper Lake, and shall be governed by applicable tribal law, including but not limited to the Habematolel Tribal Consumer Financial Services Regulatory Ordinance. You hereby agree that this governing law provision applies no matter where You reside at the time You request Your loan from Golden Valley Lending. Golden Valley Lending is regulated by the Habematolel Pomo of Upper Lake Tribal Consumer Financial Services Regulatory Commission. You may contact the Commission by mail at P.O. Box 516 Upper Lake CA 95485.

97.     On their websites, Defendants similarly claim that lending transactions and servicing are deemed to take place on the Habematolel Pomo Tribal lands, regardless of where the consumer "may be situated or access this site."

13

98. Defendants have no storefront on tribal lands to originate loans in person, and very few – if any – consumers who accessed Defendants' websites, applied for credit, and signed loan agreements did so on tribal lands.

99. Many – if not most – consumers who accessed Defendants' websites, applied for credit, and signed loan agreements did so in the states where they resided.

100. In response to complaints against Golden Valley and Silver Cloud, the Attorneys General of several states sent letters to Defendants on behalf of individual consumers.

101. Letters sent to Golden Valley or Silver Cloud from at least the State of Connecticut Department of Banking and New York Attorney General's Office alleged that the loans described in consumers' complaints appeared to violate the state usury caps and requested the lender to immediately cease collection efforts on the usurious loans.

102. In written correspondence in 2013, 2014, and 2015, counsel for Golden Valley and Silver Cloud told the New York Attorney General's Office that Golden Valley and Silver Cloud are not subject to state regulatory laws and are protected from suit by sovereign immunity.

103. In written correspondence in 2014, counsel for Silver Cloud told the State of Connecticut Department of Banking that Silver Cloud operates under a license issued by the Tribe's Consumer Financial Services Regulatory Commission.

104. In August 2013, the New York Department of Financial Services issued a Cease and Desist letter to Golden Valley, directing it to stop extending unlicensed loans that violate New York state criminal and civil usury laws.

105. After this notice was sent, Golden Valley continued collecting on loans extended to consumers residing in New York.

14

**Defendants' Collection Practices**

106.    Once the loan is disbursed to the consumer, Defendants, either directly or through service providers, contact consumers by phone, e-mail, or letter restating or implying the consumers' obligation to repay the loans.

107.    The "FAQ" section of Defendants websites also state that consumers may receive text messages "collecting on your account".

108.    Golden Valley and Silver Cloud send letters to borrowers whose payments are past due stating that they "will recommend that your account be moved to collections to receive further attention" unless consumers pay the past due amount.

109.    Golden Valley, Silver Cloud, and Mountain Summit also send letters advising consumers that upon default and acceleration of the loan, each Defendant "may exercise all rights available to it under the Consumer Loan and Arbitration Agreement."

110.    Consumers complain that Defendants, either directly or through service providers, attempted to collect debts by placing phone calls to consumers.

**STATE LAWS PROTECTING CONSUMERS
WHO TAKE OUT SMALL DOLLAR LOANS**

111.    Defendants have originated, serviced, and collected on loans that consumers are not obligated to pay, in whole or in part, based on state licensing regulations or usury caps that render non-compliant loans, such as those offered by Defendants, *void ab initio*.

112.    Defendants either took these actions directly or used service providers to take these actions on their behalf.

113.    Many states protect consumers from harmful practices associated with the origination, servicing, and collection of certain loans.

114.     Such legal protections include restrictions upon the types of entities which may engage in these types of transactions, licensing requirements, and civil and criminal usury limits.

115.     In some states, loans that violate these laws are declared void, meaning that the lender has no legal right to collect, and the borrower is not obligated to pay, some or all of the principal or interest on the loan.

**Interest-Rate Caps**

116.     The following states have enacted laws that render installment loans void if they exceed the usury limit:

a.   Arkansas, whose state constitution provides that all contracts with interest in excess of 17% "shall be void as to principal and interest. . . ." Ark. Const. amend. 89, §§ 3, 6(b);

b.   Connecticut, whose state statute voids loans under $5,000 made after July 1, 2016 with interest rates in excess of "the maximum annual percentage rate for interest that is permitted with respect to the consumer credit extended under the Military Lending Act, 10 USC 987 et seq.,"  Conn. Gen. Stat. Ann. § 36a-558(c)(1), (d)(1);

c.   New Hampshire, which prohibits annual interest rates above 36% for loans of $10,000 or less, N.H. Rev. Stat. §§ 399-A:1(XX), 399-A:16(I), and loans that do not comply with those restrictions are void, and the lender has no right to collect any principal, charges, or recompense, N.H. Rev. Stat. § 399-A:23(VIII);

d.   New York, which prohibits any person or corporation not licensed by the state of New York from "directly or indirectly charg[ing], tak[ing] or receiv[ing]

any interest . . . at a rate exceeding" annual interest of 16% on covered loans, N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a(1), and loans that exceed the rate are void, N.Y. Gen. Oblig. Law § 5-511; *see also Szerdahelyi v. Harris*, 490 N.E.2d 517, 522-23 (N.Y. 1986) ("[A] usurious transaction is void *ab initio* . . . .");

e. North Carolina, which imposes a cap on loans $25,000 and under, which is the greater of 16% or the latest published noncompetitive rate for U.S. Treasury bills with a six month maturity as of the fifteenth day of the month plus six percent (6%) rounded to the nearest one-half of one percent, N.C. Gen. Stat. § 24-1.1(a)(1), (c), and loans $15,000 and under that violate those provisions are void, and the lender has no right to collect, receive, or retain any principal or charges. N.C. Gen. Stat. § 53-166(a), (d); and

f. Since November 16, 2016, South Dakota, in which loans made by money lender licensees with an annual percentage rate above 36% are void and uncollectable, and any person evading the usury cap, including by offering loans through the internet or any electronic means, is subject to the same penalties as licensees. S.D. Codified Laws §§ 54-4-44, 54-4-44.1.

117.    Colorado prohibits annual interest above 12% on unpaid balances for loans other than supervised loans. Colo. Rev. Stat. §§ 5-1-301(12), (15)(a); 5-2-201(1). For supervised loans, Colorado prohibits a supervised lender from receiving a finance charge exceeding the equivalent of the greater of either of the following: (a) the total of 36% on unpaid balances of $1,000 or less, 21% on unpaid balances between $1000.01 and $3,000, and 15% on unpaid balances greater than $3,000, or (b) 21% per year on unpaid balances. Colo. Rev. Stat. § 5-2-201(2). Consumers

are relieved of the obligation to pay any charge that exceeds these limits and are entitled to a refund from the lender or assignee for any excess amount that they paid. Colo. Rev. Stat. § 5-5-201(2).

118.    These state usury statutes reflect the strong public policy interest in ensuring that consumers who lack negotiating power are protected from loans with excessive interest rates.

119.    Defendants made loans to consumers residing in Arkansas, Connecticut, New Hampshire, New York, North Carolina, and South Dakota that charged interest at rates exceeding those allowed by the laws of the respective states and therefore, those loans are void.

120.    Defendants made loans to consumers residing in Colorado that charged interest at rates exceeding those allowed by Colorado law and therefore, consumers were relieved of the obligation to pay charges in excess of the legal limits.

**Licensing Requirements**

121.    The following states have implemented licensing regimes that include measures aimed at preventing and penalizing harmful consumer lending practices: Arizona, Colorado, Connecticut, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio. The licensing regimes in these states reflect substantive consumer-protection concerns by, for instance:

      a.    ensuring that licensees possess the requisite character, integrity, and experience (Ariz. Rev. Stat. § 6-603(F)(2); Colo. Rev. Stat. § 5-2-302(2); Ind. Code § 24-4.5-3-503(2); 209 Mass. Code Regs. 20.03(2); N.C. Gen. Stat. § 53-168(a)(2); N.H. Rev. Stat. § 399-A:5(I); N.Y. Banking Law § 342); and

      b.    ensuring compliance with loan-term and disclosure regulations by requiring compliance examinations and investigations by state regulators as well as

recordkeeping and annual reports (Ariz. Rev. Stat. §§ 6-607, 6-608(A), 6-

609(A)-(D); Colo. Rev. Stat. §§ 5-2-304, 5-2-305; Ind. Code § 24-4.5-3-505;

Mass. Gen. Laws ch. 140 §§ 97-99; N.H. Rev. Stat. §§ 399-A:10, 399-A:11;

N.Y. Banking Law §§ 348, 349; N.C. Gen. Stat. §§ 53-184).

122.　　These state licensing statutes reflect the strong public policy interest in ensuring

that entities seeking to engage in the consumer-lending business are vetted and supervised by

regulators for compliance with consumer protections and other laws.

123.　　The following state laws render loans void if they are made without a license. If a

covered loan is made without a license in the following states, the entity has no right to collect

from consumers, or the consumers have no obligation to repay certain loan amounts:

    a.　Arizona, which voids covered loans of $10,000 or less that are made or

       procured without a license, and the lender has no right to collect any principal,

       finance charges, or other fees in repayment of such loans, Ariz. Rev. Stat. §§

       6-601(5)-(7), 6-602(B), 6-603(A), 6-613(B);

    b.　Connecticut, which since June 19, 2015, voids loans of $15,000 or less that

       charge interest in excess of 12%, when made without a license, Conn.

       Gen. Stat. Ann. § 36a-558(c);

    c.　Illinois, which voids consumer-installment loans for principal amounts not

       exceeding $40,000 made after January 1, 2013, without a license and at

       interest rates higher than 99% APR for loans up to $1,500, and the person who

       made the loan shall have no right to collect, receive, or retain any principal,

       interest, or charges related to the loan, 205 Ill. Comp. Stat. §§ 670/1,

       670/17.2(a)(1), 670/20(d);

19

d.   Indiana, which voids covered loans made without a license and the debtor has no obligation to pay either the principal or finance charges on such loans, Ind. Code §§ 24-4.5-5-202(2), 24-4.5-3-502(3);

e.   Kentucky, which voids covered loans if the interest rate exceeds the lawful rate—which is the lesser of 4% over the discount rate on ninety-day commercial paper at the Federal Reserve Bank or 19% for loans of $15,000 or less—and the loan is made without a license, and the lender has no right to collect any principal, charges, or recompense whatsoever on such loans, Ky. Rev. Stat. Ann. §§ 286.4-991(1), 286.4-420, 360.010(1);

f.   Massachusetts, which voids covered loans of $6,000 or less if interest and expenses on the loan exceed 12% a year and the loan is made or purchased without a license, and the lender or purchaser has no right to collect money in repayment of such loans, Mass. Gen. Law. Ch. 140, §§ 96, 110;

g.   Minnesota, which voids regulated loans made without a required license, and requires lenders of up to $100,000 to hold a license in order to issue loans in excess of 21.75% APR, or the total of 33% a year on the part of the unpaid balance up to $1,125 and 19% a year on the part of the unpaid balance above $1,125, Minn. Stat. Ann. §§ 56.01(a), 56.19, 56.131, 47.59 subdiv. 3(a);

h.   Montana, which requires lenders making consumer loans to hold a license, and loans made or collected by anyone other than a licensee or subject to an exemption are void, Mont. Code Ann. § 32-5-103(1), (4);

i.   New Hampshire, which voids covered loans of $10,000 or less that are made without a license, and the lender has no right to collect such loans, N.H. Rev. Stat. §§ 399-A:1(XX), 399-A:2(I), 399-A:23 (VII);

j.   New Jersey, which voids consumer loans of $50,000 or less that are made without a license, and the lender has no right to collect or receive any principal, interest, or charges on such loans, unless the act was the result of good faith error, N.J. Rev. Stat. §§ 17:11C-2, 17-11C-3, 17-11C-33(b);

k.   New Mexico, which voids loans of $2,500 or less made by a person with no license, and the lender has no right to collect, receive, or retain any principal, interest, or charges whatsoever on such loans, N.M. Stat. § 58-15-3;

l.   New York, which voids personal loans of $25,000 or less that are made without a license and where the interest or other charge exceeds that permitted to a licensee, the lender has no right to collect such loans, N.Y. Banking Law §§ 340, 355;

m.   North Carolina, which voids covered loans of $15,000 or less that are made or secured for repayment without a license and in excess of the state's general usury law, and any party in violation shall not collect, receive, or retain any principal or charges with respect to such loans, N.C. Gen. Stat. § 53-166(a), (d); and

n.   Ohio, which voids loans of $5,000 or less that are made without a license, and the lender has no right to collect, receive, or retain any principal, interest, or charges on such loans. Ohio Rev. Code Ann. § 1321.02.

124.    Colorado relieves the consumer's obligation to pay finance charges to the lender or assignee where the lender or assignee has failed to obtain the requisite license. Colo. Rev. Stat. §§ 5-5-201(1), 5-2-301(1)(a), (b), 5-1-301(17).

125.    Defendants were not licensed to make loans in any of the states described in paragraphs 123-24.

126.    Defendants made loans to consumers residing in Arizona, Connecticut, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio, and those loans are void because of Defendants' failure to acquire the required licenses.

127.    Defendants made loans to consumers residing in Colorado, and those consumers were relieved of the obligation to repay finance charges because of Defendants' failure to acquire the required licenses.

### Summary of States in Which
### Defendants' Loans Are Void in Whole or in Part

128.    Defendants' loans were void in the following states based on state licensing law, state usury law, or both: Arizona, Arkansas, Connecticut, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, and South Dakota.

129.    Colorado relieves consumers of the obligation to repay excess fees and finance charges for loans that exceed interest rates limits or are issued without a license.

130.    These states are hereinafter referred to as the "Subject States."

131.    Either directly or through service providers, Defendants collected on loans made to consumers in the Subject States that were void or that consumers had a limited obligation to repay under applicable state law.

22

## VIOLATIONS OF THE CONSUMER
## <u>FINANCIAL PROTECTION ACT</u>

### Unfair, Deceptive, or Abusive Acts or Practices

132.    Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1), prohibit a "covered person" or "service provider" from engaging in "any unfair, deceptive or abusive act or practice." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

133.    An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 12 U.S.C. § 5531(c).

134.    An act or practice is abusive if, among other things, it takes unreasonable advantage of a consumer's lack of understanding of the material risks, costs, or conditions of the product or service. 12 U.S.C. § 5531(d)(2)(A).

### Count I

*Deception Relating to the Collection of Loan Payments which Consumers Did Not Owe*
(Against All Defendants)

135.    The Bureau realleges and incorporates by reference paragraphs 1-134 of this Complaint.

136.    Through the actions set forth above, Defendants represented expressly or by implication that consumers residing in the Subject States had an obligation to repay loan amounts that in fact did not exist because the loans violated state licensing and/or usury laws that declared such loans void *ab initio* or limited consumers' obligation to repay.

137.    Through the following actions, Defendants reinforced the misrepresentations that consumers were obligated to pay debts that were void or that consumers otherwise were not obligated fully to repay in the Subject States:

23

    a.   Sending demand letters for payment;

    b.   Originating ACH debit entries from consumer bank accounts; and

    c.   Contacting consumers by telephone to demand repayment.

138.    Defendants failed to disclose that they had no legal right to collect certain loan payments because the loans were void under state law.

139.    Defendants failed to disclose that consumers had no legal obligation to pay the loan amounts because they were void under state law.

140.    In numerous instances, consumers residing in Subject States were not under a legal obligation to repay the void amounts.

141.    Defendants' misrepresentations were material and likely to mislead consumers acting reasonably.

142.    Defendants' misrepresentations, actions, and omissions constitute deceptive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count II

*Unfairness Relating to the Collection of Loan Payments which Consumers Did Not Owe*
(Against All Defendants)

143.    The Bureau realleges and incorporates by reference paragraphs 1-134 of this Complaint.

144.    Defendants caused substantial injury by servicing, extracting payments for, and collecting on loans that laws in the Subject States rendered void or limited consumers' obligation to repay.

145.    Consumers were unlikely to know that that Subject States' usury laws and licensing requirements rendered Defendants' loans void or limited consumers' obligation to

repay, and thus consumers were unable to avoid paying illegal amounts to which Defendants were not entitled.

146.    The injuries sustained by consumers residing in the Subject States were not outweighed by countervailing benefits to consumers or to competition.

147.    Defendants' actions constitute unfair acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## Count III

*Abusiveness Relating to the Collection of Loan Payments which Consumers Did Not Owe*
(Against All Defendants)

148.    The Bureau realleges and incorporates by reference paragraphs 1-134 of this Complaint.

149.    The consumer's legal obligation to repay is a material term, cost, and condition of a loan.

150.    Consumers residing in the Subject States likely were unaware that Defendants lacked the legal authority to collect the loans because the loans violated usury and licensing laws in those states.

151.    Defendants took unreasonable advantage of consumers' lack of understanding regarding the voidness of the loans or the limited obligation to repay by collecting debts to which Defendants were not legally entitled.

152.    Defendants' actions constitute abusive acts in violation of 12 U.S.C. § 5536(a)(1)(B).

## <u>VIOLATIONS OF THE TRUTH IN LENDING ACT</u>

153.  TILA and Regulation Z require certain disclosures in connection with advertising for extensions of credit and oral responses to any inquiry about the cost of credit. 15 U.S.C. § 1661 *et seq.*, 12 C.F.R. §§ 1026.16, 1026.24, 1026.26.

154.  Defendants are "creditors" as defined under TILA and Regulation Z, because they regularly extend consumer credit requiring payment of a finance charge, that is payable by agreement in twenty installments, and the obligation is initially payable to them. 15 U.S.C. § 1602(g); 12 C.F.R. § 1026.2(a)(17)(i), (v).

155.  Defendants' consumer loan agreements do not contemplate repeated transactions, and therefore Defendants' loans constitute closed-end credit. 12 C.F.R § 1026.2(a)(10), (a)(20)(i).

156.  Under TILA and Regulation Z, if an advertisement states a rate of finance charge for closed-end credit, it must state the rate as an annual percentage rate. 15 U.S.C. § 1664(c); 12 C.F.R. § 1026.24(c).

157.  In an oral response to a consumer's inquiry about the cost of closed-end credit, TILA requires creditors to state only the annual percentage rate, except that a simple annual rate or periodic rate may also be stated if it is applied to an unpaid balance. 15 U.S.C. § 1665a; 12 C.F.R. § 1026.26(b). If the annual percentage rate cannot be determined in advance, the creditor must state the annual percentage rate for a sample transaction. 12 C.F.R. § 1026.26(b).

### Count IV

*Advertising the Rate of Finance Charge without Stating an Annual Percentage Rate*
(Against All Defendants)

158.  The Bureau realleges and incorporates by reference paragraphs 1-134, 153-57 of this Complaint.

159.     Defendants advertise their installment loan products on each of Defendants' websites.

160.     These advertisements state that each installment payment includes a finance charge of $30 per every hundred dollars of principal.

161.     By disclosing the cost of consumer credit as a dollar amount on each of the websites, Defendants are disclosing a rate of finance charge.

162.     Nowhere on the websites do Defendants disclose the annual percentage rate (APR) for the installment loan product, which is typically between approximately 440% and 950% APR.

163.     Defendants' disclosure of a rate of finance charge but not the APR on the website advertisements for closed-end credit violated the Truth in Lending Act, 15 U.S.C. § 1664(c), and Regulation Z, 12 C.F.R. § 1026.24(c).

**Count V**

*Oral Disclosure of the Cost of Credit without Stating an Annual Percentage Rate*
(Against All Defendants)

164.      The Bureau realleges and incorporates by reference paragraphs 1-134, 153-57 of this Complaint.

165.     In numerous instances, in connection with the extension of credit to consumers, Defendants have responded to oral inquiries about their installment loan product.

166.     When asked about the cost of credit, Defendants' representatives orally state that each installment payment includes a $30 finance charge per hundred dollars of principal.

167.     In these conversations, Defendants have not stated the annual percentage rate for its installment loan products or described the annual percentage rate for a sample installment loan transaction.

27

168.    By orally providing cost information other than the APR (or the APR for a sample transaction) in response to inquiries about the cost of closed-end credit, Defendants violated the Truth in Lending Act, 15 U.S.C. § 1665a, and Regulation Z, 12 C.F.R. § 1026.26(b).

### Count VI

*Violation of the CFPA*
(Against all Defendants)

169.    The Bureau realleges and incorporates by reference paragraphs 1-134, 153-57 of this Complaint.

170.    The CFPA defines "enumerated consumer laws" to include the Truth in Lending Act. 12 U.S.C. § 5481(12)(O). Enumerated consumer laws are included in "Federal consumer financial law." 12 U.S.C. § 5481(14).

171.    Under the CFPA, covered persons' and service providers' acts or omissions in violations of Federal consumer financial laws are considered violations of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

172.    By virtue of their violations of TILA, Defendants have violated the CFPA.

### PRAYER FOR RELIEF

173.    Wherefore, the CFPB, pursuant to Sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's own equitable powers, request that the Court:

a.    Permanently enjoin the Defendants from committing future violations of the CFPA, TILA, or any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

b.    Grant additional injunctive relief as the Court may deem to be just and proper;

c.    Award damages and other monetary relief against Defendants as the Court finds necessary to redress injury to consumers resulting from the Defendants'

violations of the CFPA, TILA, and Regulation Z, including but not limited to restitution and the refund of monies paid;

d.   Order disgorgement against Defendants of ill-gotten gains;

e.   Award civil monetary penalties;

f.   Award the costs of bringing this action; and

g.   Award additional relief as the Court may determine to be just and proper.

Dated: April 27, 2017          Respectfully submitted,

Anthony Alexis (DC Bar # 384545)
*Enforcement Director*
Deborah Morris (Admitted to NY Bar)
*Deputy Enforcement Director*
Craig Cowie (DC Bar # 491707)
*Assistant Litigation Deputy*

 _/s/ Mary Olson_____
Mary Olson (IL Bar # 6297334)
(local counsel)
*Enforcement Attorney*
Consumer Financial Protection Bureau
230 S. Dearborn St., Suite 1590
Chicago, IL 60604
Telephone: 312-610-8977
Fax: 202-435-7722
Email: Mary.Olson@cfpb.gov

Vanessa Buchko (DC Bar # 502578)
Gabriel S.H. Hopkins (NY Bar # 5242300)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Buchko): 202-435-9593
Telephone (Hopkins): 202-435-7842
Fax: 202-435-7722
E-mail: Vanessa.Buchko@cfpb.gov
E-mail: Gabriel.Hopkins@cfpb.gov
*Attorneys for Consumer Financial Protection Bureau*